UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Patricia Crumley, on behalf of herself
and all others similarly situated,

                    Plaintiff,

vs.

Time Warner Cable, Inc., a division of
Time Warner Entertainment Company,
Inc.,

                    Defendant.

Case No. 07-3946 (JNE/JJG)

**MEMORANDUM OF LAW
IN SUPPORT OF
DEFENDANT'S MOTION
TO DISMISS OR
ALTERNATIVELY STAY
PROCEEDINGS**

KELLY & BERENS, P.A.
Timothy D. Kelly (#54926)
Tracey L. Baubie (#0224625)
3720 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 349-6171

WARGO & FRENCH LLP
Michael S. French (admitted *pro hac vice*)
Joseph W. Ozmer, II (admitted *pro hac vice*)
1170 Peachtree Street,
Suite 2020
Atlanta, Georgia 30309
(404) 853-1510

***Attorneys for Defendant***

## I.   INTRODUCTION

*"Allowing plaintiffs to collect damages measured by the difference between the filed rate and the rate a court finds reasonable would encourage consumers of a utility's services to sit out the state's rate-making process and then to repair to court to play litigation lottery.   There could be no end to the number of strike suits that would be brought as eager lawyers, using the class action vehicle, circumvent the states' rate-making mechanisms – all at the expense of consumers."*

*Taffet v. The Southern Co.*, 967 F.2d 1483, 1492 (11th Cir. 1992) (explaining policies underlying "filed rate doctrine") (emphasis added).   As demonstrated *infra*, Plaintiff's claims in this action are barred by the filed rate doctrine, as well as preempted by federal law.

In order to construct and operate a cable television system, a cable television operator must have a franchise from the local governmental entity (here the Local Franchising Authority or "LFA") authorized by state law to grant a cable franchise.[1]   That franchise allows the cable television operator to construct a cable television system within the area to be served by the cable system over public rights-of-way and through easements that have been dedicated for compatible uses.[2]

---

[1]   47 U.S.C. §541(b)(1).

[2]   47 U.S.C. §541(a)(2).

The rates that a cable television operator may charge for the entry level of service -- referred to as the Basic Service Tier ("BST") -- are subject to regulation by the LFA in accordance with procedural and substantive regulations promulgated by the FCC. Where, as here, the LFA is certified by the FCC to regulate BST rates, the local cable operator must submit its rate forms and proposed rates to the LFA and the LFA either accepts or rejects the proposed rates. The LFA's decision regarding the proposed rates may then be appealed to the FCC.[3]

This is the regulatory scheme that Congress created and that the FCC has implemented over the past 15 years. If a cable customer is unhappy with the BST rate set through this process, the exclusive forum for his or her complaint is the LFA. Once the rates are determined pursuant to the regulatory framework described above, neither Congress nor the courts permit the tens of millions of cable customers across the country to inundate the judicial system with rate challenges.

---

[3] The Cable Act provides that an LFA, such as the city of Minneapolis in this case, may file with the FCC for certification to regulate BST rates. 47 U.S.C. § 543(a)(2)-(4). *See also* 47 C.F.R. § 76.910. The substantive and procedural regulations governing the LFA's regulation of rates are set forth in 47 C.F.R. Part 76, Subpart N. More specifically, the regulations governing the filing of proposed rates by cable operators, as well as the LFA's authority and prerogatives in accepting or rejecting those rates, prescribing different rates or ordering refunds, are set forth primarily in 47 C.F.R. §§ 76.930; 933; 940-42. These regulations (and other pertinent FCC regulations) are discussed *infra*, at Section II(A)(2).

3

In the instant matter, Defendant Time Warner Cable Inc. ("TWC"), was formerly a cable operator in Minneapolis.[4]  During the period at issue here, the City of Minneapolis, the relevant LFA, was certified by the FCC to regulate TWC's BST rates.  The 2001 BST rate approved by the City of Minneapolis is challenged by the Plaintiff as "unlawful" and "fraudulent" in violation of the Minnesota Prevention of Consumer Fraud Act ("MPCFA") (Minn. Stat. Ann. §§ 325F.68-.70) and as having unjustly enriched TWC.  Plaintiff seeks damages in the form of a refund of the allegedly fraudulent rates charged and collected by TWC, and declaratory relief.

Plaintiff's attempt to play "litigation lottery"[5] must be rejected for several reasons.  First, Plaintiff's claims are barred in their entirety by the filed rate doctrine, which prohibits a consumer from challenging a rate in court that has been filed with and reviewed by the appropriate regulatory authority.  Second, Plaintiff's state law claims are preempted by federal law, as they impermissibly attempt an "end run" around the regulatory framework established by Congress and the FCC.

Finally, even if Plaintiff's claims were not barred by the above prohibitions, Plaintiff's claims are subject to dismissal because Plaintiff's Subscriber Agreement

---

[4]  Effective August 1, 2006, TWC transferred its interest in the Minneapolis cable system to Comcast Corporation.  This transfer was approved by the City of Minneapolis.

[5]  *Taffet*, 967 F.2d at 1492.

4

with TWC provides that "any past, present or future controversy or claim arising
out of or related to this Agreement shall be resolved by binding arbitration."
Accordingly, pursuant to the Federal Arbitration Act ("FAA"), Plaintiff's claims
must be adjudicated in the arbitral forum chosen by the parties.  Therefore, TWC
respectfully requests that Plaintiff's Amended Complaint be dismissed in its
entirety.

## II.    FACTUAL BACKGROUND

### A.    THE CHALLENGED RATE IS SUBJECT TO A COMPLEX REGULATORY FRAMEWORK

#### 1.    Congress and the FCC have developed a comprehensive scheme for regulating BST cable rates.

Plaintiff challenges TWC's BST rates for the City of Minneapolis.  (*See,
e.g.,* Amended Complaint ("Compl."), ¶ 23) (alleging TWC used Form 1235 to
"overcharge" for basic service tier in Minneapolis)).  Pursuant to FCC
requirements, cable companies must sell the BST to all cable customers as the first
tier purchased.  47 C.F.R. § 76.920.  The BST typically contains limited channels
such as the local broadcast television networks (including Channels 4, 5, 9 and 11
locally) and public, educational and government access channels.  It does not
generally include channels such as ESPN and CNN that are brought in from distant
areas.

As noted above, rates for the BST are regulated by the LFA. As Plaintiff acknowledges, this BST rate regulation is the product of a comprehensive regulatory framework that has evolved across three federal statutes, extensive FCC regulations implementing and interpreting those statutes, as well as regulation by the LFAs (the City of Minneapolis, in this case). (Compl., ¶¶ 12-27).

Congress first addressed cable television rate regulation in the Cable Communications Policy Act of 1984 (the "1984 Act").[6] The 1984 Act amended the Communications Act of 1934 to, among other things, add a new Section 623 (codified at 47 U.S.C. § 543(a)). The purpose of Section 623 was to carefully delineate the boundaries of federal, state and local regulation of cable television rates and to "establish [ ] a uniform Federal policy for the regulation of subscriber rates by franchising authorities for cable service." H.R. Rep. No. 98-934, pt. II at 65 (1984).

Section 623 was substantially revised by the Cable Television Consumer Protection and Competition Act of 1992 (the "1992 Act").[7] The 1992 revisions to Section 623 expanded the federal role in the area of rate regulation. Specifically, Section 623(b) directed the FCC to adopt regulations to ensure that BST rates charged by cable operators were "reasonable." 47 U.S.C. § 543(b)(1).

---

[6] Pub. L. 98-549.

[7] Pub. L. 102-385.

Pursuant to this directive, the FCC established substantive and procedural standards to govern the review and regulation of BST rates by the LFAs. *See* 47 C.F.R. § 76.901 *et. seq.* The FCC's implementation of the 1992 Act's rate regulation provisions has been an ongoing process over the past fifteen years, encompassing literally thousands of pages of rulemaking orders, rate forms, declaratory rulings and adjudicatory decisions resolving rate complaints and appeals of local rate orders.

In Section 623(a)(2)(A) of the 1992 Act, Congress delegated to LFAs the authority to determine the reasonableness of a cable operator's BST rate, subject to the substantive rate formulas and procedures adopted by the FCC. 47 U.S.C. § 543(a)(2)(A). However, to protect the uniform rate regulation system it developed, Congress elected to preempt other state regulation of cable rates. Specifically, the statute provides, in pertinent part:

> **No Federal agency or State may regulate the rates for the provision of cable service except to the extent provided under this section . . .** Any franchising authority may regulate the rates for the provision of cable service . . . but only to the extent provided under this section.

47 U.S.C. § 543(a)(1) (emphasis added). Thus, the BST rates charged by TWC and challenged by Plaintiff are the product of extensive regulation imposed by Congress, implemented by the FCC and applied by the City of Minneapolis.

7

2.    **Form 1235 and the BST rate are filed with and regulated by the LFA pursuant to the rules established by the FCC.**

Where, as here, a cable operator is regulated by an LFA, the operator's proposed annual BST rates -- including Forms 1235 and 1240 -- must be filed with the LFA 90 days prior to implementation of the rate. *See, e.g.,* 47 C.F.R. §§ 76.930 and .933(g).[8] The LFA may approve the rate, reject the rate or prescribe a different rate altogether. 47 C.F.R. §§ 76.940-41. If the LFA takes no action during the initial 90 day review period, the proposed rate may go into effect. 47 C.F.R. § 76.933(g)(2).

Notwithstanding this initial 90 day review period, the LFA still has up to one year to reject the proposed rate. *Id.* If the LFA disapproves the rate or any portion thereof (*e.g.*, an upgrade charge based on Form 1235), the LFA may order a prospective rate reduction and a refund. *Id.;* 47 C.F.R. §§ 76.940-42. Notably, however, ***upon the expiration of 12 months from the date the operator files its proposed rates with the LFA, those rates are immunized from further refund***

---

[8] The starting point for BST rate setting is for the cable operator to file FCC Form 1240 and, if a system upgrade has been completed and the operator so chooses, Form 1235. 47 C.F.R. § 76.922(j). Form 1240 may be filed annually by cable operators to adjust their maximum permitted BST rates due to increases or decreases in external costs, the addition and deletion of channels from regulated tiers, and inflation. By contrast, Form 1235 may be used by cable operators to increase BST rates to recover the cost of "significant network upgrades requiring added capital investment." 47 C.F.R. § 76.922(j)(1). Forms 1235 and 1240 are available on the FCC website at: http://www.fcc.gov/Forms/Form1235/1235.pdf; and http://www.fcc.gov/omd/pra/docs/3060-0685/3060-0685-07.doc.

*liability*. 47 C.F.R. § 76.942(b) ("An operator's liability for refunds is limited to a one-year period . . ."); 47 C.F.R. § 76.933(g)(2) ("In the event the franchising authority does not act within this 12-month period, it may not at a later date order a refund or prospective rate reduction with respect to the rate filing.").[9]

### 3.   The FCC is the sole forum for appeals of rate decisions by the LFA, including decisions regarding Form 1235 charges.

The FCC serves as the "**sole forum** for appeals of decisions by franchising authorities on rates for the basic service tier or associated equipment involving whether or not a franchising authority has acted consistently with the Cable Act or §§ 76.922 and 76.923." 47 C.F.R. § 76.944 (emphasis added). Accordingly, appeals of an LFA's decision on whether to permit an upgrade charge pursuant to Form 1235, as provided for by 47 C.F.R. § 76.922(j)(1), may be heard only by the FCC, *not the courts*. 47 C.F.R. § 76.944.

## B.   PLAINTIFF'S CLAIMS INTRUDE UPON THE REGULATORY RATEMAKING SCHEME

### 1.   Plaintiff attacks TWC's regulated BST rate.

The crux of Plaintiff's Amended Complaint is that TWC allegedly filed a Form 1235 in 2001 that contained fraudulent information, that the City approved an inappropriate BST rate based on this filing and that Plaintiff was therefore

---

[9]   Accordingly, as discussed *infra*, Plaintiff's attempt to obtain refunds six years after TWC allegedly filed the challenged rate is plainly inconsistent with the federal regulatory scheme.

"overcharged" for the BST.[10]  (Compl., ¶¶ 2-3, 8, 17-19, 23-27, 31, 45-48).  As

such, Plaintiff is directly challenging the BST rate TWC filed with the LFA and

seeking a refund of the alleged "overcharges" resulting from the implementation of

this rate.  (*Id.*).

### 2.    Plaintiff's claims require the Court to make determinations that are within the exclusive realm of the LFA and FCC.

Plaintiff's challenge to TWC's BST rates constitutes an obvious intrusion

upon the prerogatives and jurisdiction of the FCC and the City of Minneapolis.

Questions regarding the appropriateness of TWC's filed BST rate and the Form

1235 component thereof fall squarely within the FCC regulatory scheme providing

that such issues will be determined exclusively by the LFA and the FCC, not by

lawsuits based on state common law or consumer protection statutes.  Accordingly,

as shown *infra*, Plaintiff's claims fail as a matter of law, as:  (1) Plaintiff's

intrusion upon the regulatory ratemaking framework is barred by the filed rate

doctrine; and (2) Plaintiff's attempt to use state statutory and common law claims

to retroactively regulate and overturn TWC's BST rates is preempted by federal

law.

---

[10]  TWC strongly disputes Plaintiff's allegations of wrongdoing regarding TWC's rates, including Plaintiff's allegation that TWC submitted a "fraudulent" Form 1235.  In the event Plaintiff's claims survive this Motion, TWC will demonstrate the propriety of the challenged rate.

## III.   ARGUMENT AND CITATION OF AUTHORITY

## A.   THE FILED RATE DOCTRINE BARS PLAINTIFF'S CLAIMS

The filed rate doctrine originates from the United States Supreme Court's decision in *Keough v. Chicago & Northwestern R. Co.*, 260 U.S. 156 (1922). In *Keough,* the plaintiff alleged that the defendants, interstate freight shippers, violated the Sherman Antitrust Act by charging tariff rates that were the product of an illegal price fixing agreement. The plaintiffs claimed that the rates they were charged were "higher than the rates would have been" absent the illegal agreement. *Id.* at 160. The defendant in *Keough* had filed all of its tariff rates with the Interstate Commerce Commission ("ICC"), and the ICC had approved the challenged rates. The Supreme Court held that the plaintiff could not recover damages for the alleged overcharges. The court reasoned that the ICC's approval had, in effect, established the lawfulness of the challenged rates. "Unless and until suspended or set aside, [the ICC-approved] rate is made, for all purposes, the legal rate, as between the carrier and the shipper. The rates defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." *Id.* at 163.

Following *Keough*, additional litigation has established the substantial breadth of what has become known as the filed rate doctrine. Indeed, as this Court has noted, *"the Keough holding has evolved through subsequent cases into a doctrine forbidding a federal court from collaterally reviewing rates filed with*

11

*and approved by an appropriate regulatory agency."* Hilling v. Northern States

*Power Co.*, No. 3-90-CIV-418, 1990 WL 597044 at * 2 (D. Minn. Dec. 12, 1990)

(applying doctrine to regulated power rates) (emphasis added). *See also, e.g.,*

*Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994) (telephone rates);

*Schermer v. State Farm Fire and Casualty Co.*, 702 N.W.2d 898, 906 (Minn. Ct.

App. 2005), *aff'd*, 721 N.W.2d 307 (2006) (insurance rates).

### 1.  Plaintiff's claims fall squarely within the prohibition of the filed rate doctrine.

Succinctly stated, "[t]he filed rate doctrine prohibits a party from recovering

damages measured by comparing the filed rate and the rate that might have been

approved absent the conduct at issue." *H.J. Inc. v. Northwestern Bell Telephone*

*Co.*, 954 F.2d 485 (8th Cir. 1992), *citing Arkansas Louisiana Gas Co. v. Hall*, 453

U.S. 571, 578-79 (1981). *"The doctrine holds that any filed rate – a rate that has*

*been approved by the governing regulatory agency – 'is per se reasonable and*

*unassailable in judicial proceedings brought by ratepayers.'"* *Schermer,* 702

N.W.2d at 906, *quoting Wegoland,* 27 F.3d at 18 (emphasis added).

The purpose of the filed rate doctrine is to:

(1) preserve the regulating agency's authority to determine the
reasonableness of rates; and (2) insure that the regulated entities charge only
those rates that the agency has approved or been made aware of as the law
may require.

*H.J., Inc.*, 954 F.2d at 488; *accord, Schermer*, 702 N.W.2d at 907. "As compared with the expertise of regulatory agencies, courts do not approach the same level of institutional competence to ascertain reasonable rates. . . . Courts are simply ill-suited to systematically second guess the regulators' decisions and overlay their own resolution." *Schermer,* 702 N.W.2d at 907*, quoting Wegoland*, 27 F.3d at 19. Further, "[*a]llowing plaintiffs to collect damages measured by the difference between the filed rate and the rate a court finds reasonable would encourage consumers of a utility's services to sit out the state's rate-making process and then to repair to court to play litigation lottery. There could be no end to the number of strike suits that would be brought as eager lawyers, using the class action vehicle, circumvent the states' rate-making mechanisms – all at the expense of consumers.*" *Taffet,* 967 F.2d at 1492 (emphasis added).[11]

---

[11] Looking at this issue from another perspective, a consumer of a regulated entity's services "has no legal right to pay any rate other than the one established" via the appropriate regulatory process. *Taffet,* 967 F.2d at 1494; *see also Keough,* 260 U.S. at 163 (holding antitrust plaintiff lacked standing due to inability to establish "injury" because defendants' filed shipping rates were, "for all purposes, the legal rate, as between carrier and shipper" and "the rights defined by the tariff [could not] be varied or enlarged by either contract or tort of the carrier."). Thus, Plaintiff lacks standing to assert claims under either the MPCFA or for unjust enrichment because Plaintiff cannot establish a right to pay any rate other than the rate filed by TWC with the City of Minneapolis. *Id.; see also* Mn. Stat. Ann. § 8.31, Subd. 3a ("any person injured by a violation of any of the laws referred to in subdivision 1 [including the MPCFA] may bring a civil action . . ."); *Bykov v. Radisson Hotels Intern., Inc.*, No. 06-2102, 221 Fed.Appx. 490, 492, 2007 WL 444956, *1 (8th Cir. Feb. 12, 2007) (upholding dismissal of unjust enrichment claim for lack of standing due to plaintiff's failure to establish injury).

There is no exception to the filed rate doctrine where the plaintiff claims, as here, that regulators were somehow duped or defrauded into approving unfair or unreasonable rates. *E.g.*, *H.J. Inc.*, 954 F.2d at 492 (holding that filed rate doctrine barred RICO claims based on allegation that telecommunications provider obtained rate increase by bribing regulators); *Schermer*, 702 N.W.2d at 906 (holding that filed rate doctrine barred MPCFA claims based on allegation that insurance company obtained rate increase by filing misleading actuarial statements with regulatory agency). Thus, the nature of the alleged underlying conduct that resulted in the challenged rate has no impact on the applicability of the filed rate doctrine, as discussed *infra*. *Id.*

**2.    Binding authority requires that Plaintiff's Amended Complaint be dismissed in its entirety.**

The regulated entities' alleged behavior in *H.J., Inc.* and *Schermer* was significantly more egregious than that *alleged* here, yet the courts held fast to the filed rate doctrine. For example, in *H.J., Inc.* the defendant's customers asserted RICO claims based on the allegation that defendant "bribed members of the Minnesota Public Utilities Commission for the purpose of influencing the officials in setting telephone rates in Minnesota." *H.J., Inc.*, 954 F.2d at 486. The district court nevertheless granted the defendant's motion to dismiss the customers' RICO claims on the ground that they were barred by the filed rate doctrine. *Id.*

14

On appeal, the customers argued that the filed rate doctrine should not be "applied when the fraud that has been committed is extrinsic fraud or a fraud committed upon the agency itself." *Id.* at 489. The Eighth Circuit rejected this argument, however, holding that:

> [T]he underlying conduct does not control whether the filed rate doctrine applies. Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations.

*Id.* The court reasoned:

> The H.J. class cannot contend that there could be no charge for telephone services. Rather, the H.J. class's claim is simply that its members have been injured because they paid too much for telephone services or that there could be no rate increases for the 1980-1986 period, a damage concept that falls squarely within the filed rate doctrine.

*Id.* at 492. Based on this analysis, the court affirmed the district court's decision dismissing the customers' claims in their entirety. *Id.* at 496.

Similarly, *Schermer* involved a class action brought by homeowners who claimed that the defendant insurer had overcharged them for homeowner's insurance. *Schermer*, 702 N.W.2d at 902. Specifically, the homeowners claimed that the defendant had procured a premium rate increase by submitting misleading actuarial data in support of its rate filings with the Minnesota Department of Commerce (the "DOC"). *Id.* at 906. The homeowners sought a refund of the alleged overcharges under a number of legal theories, including a claim that the

15

defendant had violated the MPCFA. *Id.* at 902. The defendant moved for

summary judgment on the ground that the homeowners' claims were barred by the

filed rate doctrine. *Id.* at 903. The district court granted defendant's motion and

dismissed the homeowners' claims.

On appeal, the Minnesota Court of Appeals affirmed the ruling of the trial

court. *Id.* at 908. The court rejected the plaintiffs' argument that the alleged fraud

perpetrated by the defendant against the DOC and the public removed plaintiffs'

claims from the reach of the filed rate doctrine. *Id.* at 906 (adopting reasoning and

holding of *Wegoland*, 27 F.3d 17, that there is no fraud exception to filed rate

doctrine).[12] The court reasoned that application of the filed rate doctrine avoided

"undermin[ing] the congressional scheme of uniform rate regulation" and

"preserves the regulatory agency's authority to determine the reasonableness of an

entity's filed rates." *Id.* at 906-07 (citations omitted).[13]

The holdings in *H.J., Inc.* and *Schermer* require that this Court dismiss

Plaintiff's Amended Complaint in its entirety. It is undisputed that TWC's BST

[12] In *Wegoland*, the plaintiff class alleged that two telephone companies gave
regulatory agencies and consumers misleading financial information to support the
rates they requested. *Wegoland, Ltd. v. NYNEX Corp.*, 806 F. Supp. 1112, 1113
(S.D.N.Y. 1992), *aff'd*, 27 F.3d 17 (2d Cir. 1994). The Second Circuit affirmed the
district court's holding that the filed rate doctrine barred the plaintiff's claims and
that there is no fraud exception to the doctrine. *Wegoland*, 27 F.3d at 21-22.

[13] The Minnesota Supreme Court upheld the Court of Appeals decision based
solely on the application of the filed rate doctrine. *Schermer v. State Farm Fire
and Casualty Co.*, 721 N.W.2d 307 (Minn. 2006).

16

rate challenged here was filed with and approved by the appropriate regulatory

authority – the City of Minneapolis (the LFA). Nonetheless, like the plaintiffs in

*H.J., Inc.* and *Schermer*, the Plaintiff in the current case challenges the rate as

unlawful, claiming it was procured through fraudulent conduct. *Compare* Compl.,

¶¶ 23, 42 to *H.J., Inc.,* 954 F.2d at 489 and *Schermer,* 702 N.W.2d at 906.

Moreover, Plaintiff seeks "actual damages" and/or "restitution" based on the

difference between the rate actually charged by TWC and the rate that would have

been approved but for TWC's alleged fraud – *i.e.*, a refund of the alleged

"overcharges" resulting from TWC's allegedly fraudulent rate increases. (Compl.,

¶¶ 48-50). Therefore, Plaintiff stands in the exact same position as the plaintiffs in

*H.J., Inc.* and *Schermer*, and her claims must be dismissed with prejudice based on

the clear prohibition of the filed rate doctrine. *H.J., Inc.,* 954 F.2d at 489;

*Schermer,* 702 N.W.2d at 902; *Schermer,* 721 N.W.2d 307.

### B.   **PLAINTIFF'S CLAIMS ARE PREEMPTED**

#### 1.   **Plaintiff cannot use state law causes of action to evade the regulatory framework governing BST rates.**

As noted above, the Cable Act expressly provides that "***no Federal agency***

***or State may regulate the rates for the provision of cable service*** except to the

extent provided" by the Act. 47 U.S.C. § 543(a)(1) (emphasis added). Thus, not

surprisingly, courts have repeatedly observed that "the 1992 Cable Act generally

prohibits states from regulating cable rates." *Time Warner Cable Inc. v. Doyle,* 66

F.3d 867, 873 (7th Cir. 1995) (emphasis added); *see also Cable Television Ass'n. of New York, Inc. v. Finneran*, 954 F.2d 91, 98 (2d Cir. 1992) ("The Act removed state authority . . . in regulation of rates for cable services."). This prohibition on state regulation of cable rates bars a plaintiff's state law causes of action when they are asserted in a manner that approaches regulation of rates for the provision of cable services. *E.g.*, *Doyle,* 66 F.3d at 881-82 (preempting lawsuit based on state consumer protection statute where application was tantamount to rate regulation); *Laarkamp v. Comcast Corp.*, No. 9408-0098, 1997 WL 469323 (Pa. Com. Pl. 1997) (preempting subscriber class action challenging negative option billing under state law as inconsistent with FCC's ratemaking regulations).

In the instant action, Plaintiff's claims are preempted because Plaintiff's Amended Complaint -- on its face -- seeks to use state law to retroactively regulate the "rates for the provision of cable services" that TWC charged its Minneapolis customers. That is, pursuant to state law theories of unjust enrichment and the MPCFA, Plaintiff seeks refunds ("restitution" and/or "actual damages") based on the allegedly "overcharged" BST rates, as well as a declaration that those rates are "unlawful." (Compl., ¶¶ 38-42, 48-50).

There is no question that declaring TWC's rate to be "unlawful" and awarding damages based on some different "proper" rate would constitute retroactive rate regulation. *Doyle*, 66 F.3d at 881 (noting that requiring cable

operator to disgorge revenue it earned under disputed billing practice would be tantamount to rate regulation, and therefore preempted); *Westmarc Comm., Inc. v. Conn. Dep't of Public Utility Control*, 807 F. Supp. 876, 884-89 (D. Conn. 1990) (lawsuit to prevent cable operator from including pass through charge for fines imposed by state in its rates was tantamount to rate regulation and therefore preempted).  Accordingly, Plaintiff's attempt to use state law as a vehicle to retroactively dictate TWC's rates is preempted pursuant to 47 U.S.C. § 543(a)(1). *Doyle,* 66 F.3d at 881-82.

### 2.   Plaintiff's MPCFA claim (Count III) is not saved by 47 U.S.C. § 552(d)(1).

Plaintiff cannot salvage her consumer fraud count by seeking refuge under the consumer protection savings clause embodied in 47 U.S.C. § 552(d)(1). Although that section provides that "[n]othing in this subchapter shall be construed to prohibit any State or any franchising authority from enacting or enforcing any consumer protection law, *to the extent not specifically preempted by this subchapter,*" consumer protection laws <u>are</u> specifically preempted by Section 543(a)(1) where, as here, their application amounts to regulation of cable rates. Indeed, the FCC's regulations leave no room for doubt as to this issue, providing:

> State and local governments may not enforce state and local consumer protection laws that conflict with or undermine paragraphs (a) or (b) of this Section *or any other sections of this Subpart that were established pursuant to Section 3 of the 1992 Cable Act, 47 U.S.C. § 543.*

19

47 C.F.R. § 76.981(c) (emphasis added).  Further, quoting the legislative history of

the Cable Act, courts have explained that "[a] state or franchising authority may

not, for instance, regulate the rates for cable services in violation of section [543],

and attempt to justify such regulation as a 'consumer protection' measure." *City of*

*Dubuque v. Group W Cable, Inc.*, No. C 85-1046, 1987 WL 11826, *2 (Feb. 25,

1987 N.D. Iowa), *quoting* H.R. Rep. No. 98-934, pt. IV, at 74 (1984); *Town of*

*Norwood v. Adams-Russell Co.*, 549 N.E.2d 1115, 1120 n.13 (Mass. 1990) (same).

Accordingly, courts have recognized that the Cable Act preempts consumer

protection laws where, as in this case, a plaintiff employs them to obtain damages

based on a disputed rate.  As the Seventh Circuit observed in *Doyle*:

> Were the State to order Time Warner to turn over all of its receipts
> from the sale of the *à la carte* service, Time Warner essentially
> would have been required to provide the service for free.  However,
> as noted above, the Cable Act prohibits the State from regulating
> the rates Time Warner charged for this service.

*Doyle*, 66 F.3d at 881.  Based on this observation, the *Doyle* court held that *"the*

*FCC acted reasonably to the extent its regulation preempts the state statutory*

*remedy of disgorgement of the revenue earned under the disputed billing*

*practice."* *Id.* (emphasis added).

Plaintiff's claim in the instant case is on the same footing as *Doyle*, as

Plaintiff invokes state consumer protection law to disgorge allegedly

"overcharged" amounts earned from a disputed rate.  Therefore, because *"the rate*

*structure is a federal matter and state consumer laws that impact upon it conflict with the operation of the rate structure,"* Plaintiff's consumer protection claim is preempted by federal law. *Id.* at 882.

### 3. Plaintiff's claims are preempted because they are inconsistent with the FCC's regulations governing rate challenges and refunds.

Preemption also applies because Plaintiff's state law claims are inconsistent with the regulatory framework established by the FCC for challenging rates and ordering refunds. *See Doyle,* 66 F.3d at 875 (noting that state law is preempted where inconsistent with statutorily authorized regulations of agency). First, as noted above, *the FCC is the "sole forum for appeals of decisions by franchising authorities on rates for the basic service tier* . . . involving whether or not a franchising authority has acted consistently with the Cable Act or §§ 76.922 and 76.923." 47 C.F.R. § 76.944 (emphasis added). Plaintiff admits that TWC's BST rate and Form 1235 were filed with the LFA. (Compl., ¶¶ 21-24). TWC's BST rate and the Form 1235 component thereof could have been maintained only through a decision of the LFA to permit that rate. 47 C.F.R. §§ 76.933, 76.940-42. Plaintiff's attempt to attack that rate in this Court is plainly inconsistent with the regulatory scheme mandating that the FCC shall be the "**sole forum**" for challenging the LFA's decision regarding the disputed BST rate. Accordingly, Plaintiff's claims are preempted. *E.g., Doyle,* 66 F.3d at 875 ("The statutorily

authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof.").

Second, as further noted above, if an LFA does not order a refund within 12 months from the cable operator's submission of its proposed rates to the LFA, the rate is no longer subject to refund liability.  47 C.F.R. §§ 76.942(b) (*"an operator's liability for refunds is limited to a one-year period* . . .") (emphasis added); *see also* 47 C.F.R. § 76.933(g)(2) (same).  Here, Plaintiff's lawsuit seeks to obtain refunds 6 years after the challenged rate has been immunized from such liability.  Plaintiff's attempt to achieve what even the LFA and the FCC cannot order is plainly inconsistent with the regulatory scheme, and therefore preempted.  *See Arkansas Louisiana Gas Co.*, 435 U.S. at 580 (noting in context of gas regulation that "it would surely be inconsistent with this congressional purpose to permit a state court to do through a breach-of-contract action what the Commission itself cannot do.").

## C.   THE PARTIES' AGREEMENT TO ARBITRATE MANDATES DISMISSAL OF THIS ACTION

### 1.   The parties' Agreement contains an arbitration clause.

As noted above, this case should be dismissed based on the filed rate doctrine and/or preemption.  However, if the Plaintiff's claims are allowed to stand in the face of these defects, the case should be dismissed in favor of arbitration.  TWC residential service customers are subject to a Residential Services Subscriber

Agreement ("Agreement") which governs the relationship between the customer

and TWC. (*See* Exh. "A," Jeannie Boldt Declaration ("Boldt Decl."), ¶ 4).[14]

TWC informs customers of changes in the Agreement and provides copies of any

updated Agreement with the customer's monthly bill. (*Id.*).[15] The current

Agreement was sent to all TWC Minneapolis customers between January 22, 2006

and February, 22, 2006. (*Id.*, ¶¶ 3-7). More specifically, the Agreement was

provided to Plaintiff with her January 23, 2006 bill. (*See* Exh. "B," Efraim J.

---

[14] There is no question that the Court may consider the parties' contract and the arbitration clause contained therein, as this Section of TWC's Motion relies upon Rule 12(b)(1), not Rule 12(b)(6). *E.g., Olsher Metals Corp. v. Olsher*, No. 01-3212, 2003 WL 25600635, *1 (S.D. Fla. March 26, 2003) ("The motion to dismiss in favor of arbitration is premised on Fed. R. Civ. P. 12(b)(1). Accordingly, I may consider information outside of the pleadings in determining if dismissal is appropriate.") (citation omitted); *Brennan v. Bally Total Fitness*, 198 F. Supp.2d 377, 381 (S.D.N.Y. 2002) ("Defendant has moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and to compel arbitration pursuant to the FAA. On a motion to dismiss for lack of jurisdiction, a court may consider materials outside of the pleadings."). Moreover, "even if the present motion was interpreted as one under Rule 12(b)(6), the court could still opt to consider the arbitration contract without converting the motion to a Rule 56 motion . . ." *Lamb v. General Elec. Consumer & Indus.*, No. 1:06-CV-216, 2006 WL 2228962, *1, n.2 (N.D. Ind. Aug. 3, 2006), *citing Continental Gas Co. v. American Nat. Ins. Co.*, 417 F.3d 727, 731 (7th Cir. 2005).

[15] TWC's method of providing notice of the Agreement to Plaintiff by including it in Plaintiff's monthly bill complies with federal law. *See, e.g.,* 47 U.S.C. § 552(c) ("A cable operator may provide notice of service and rate changes to subscribers using any reasonable written means at its sole discretion."). *See also Dambrosio v. Comcast Corp.*, No. 04-4330, 142 Fed. Appx. 87, 88-89, 2005 WL 1793510, at *1-2 (3d Cir. July 29, 2005) (subscriber agreement containing new arbitration clause provided with customer monthly bills was "reasonable written means" to provide notice under Cable Act).

Donato Declaration ("Donato Decl."), ¶¶ 4-13 and Exhibit B thereto). Plaintiff's

receipt of this bill and the Agreement contained therewith is evidenced by her

payment of the invoice in which the Agreement was contained. (Boldt Decl., ¶ 8).

The Agreement includes an arbitration clause which provides:

> Except for claims for injunctive relief as described below, any past,
> present, or future controversy or claim arising out of or related to this
> agreement shall be resolved by binding arbitration administered by the
> American arbitration association under its commercial arbitration
> rules. Including, if applicable, the supplementary procedures for the
> resolution of consumer related disputes. Consolidated or class action
> arbitrations shall not be permitted. The arbitrator of any dispute or
> claim brought under or in connection with this agreement shall not
> have the power to award injunctive relief. Injunctive relief may be
> sought solely in an appropriate court of law. No claim subject to
> arbitration under this agreement may be combined with a claim
> subject to resolution before a court of law. The arbitrability of
> disputes shall be determined by the arbitrator. Judgment upon an
> award may be entered in any court having competent jurisdiction. If
> any portion of this section is held to be unenforceable, the remainder
> shall continue to be enforceable.

(*Id.* at Exh. B thereto (Agreement), Sect. 14). In order to make this provision stand

out and be noticed by its customers, TWC prints it in all capital letters. (*Id.*). Both

TWC and Plaintiff performed under the Agreement, as TWC provided cable

television services to Plaintiff, while Plaintiff accepted those services and paid

TWC for same. (*Id.*, ¶ 8). Accordingly, the Agreement constitutes a binding

contract between the parties.

**2.     The instant dispute is subject to arbitration pursuant to federal law and the Agreement.**

It is well-settled the Federal Arbitration Act ("FAA") manifests a "strong federal policy in favor of arbitration." *Airtel Wireless, LLC v. Montana Electronics Co.*, 393 F. Supp. 2d 777, 785 (D. Minn. 2005). The Eighth Circuit emphasizes that the FAA "leaves no place for the exercise of discretion by a district court" when an arbitration agreement is at issue, and the district court's role is limited to determining "whether a valid agreement to arbitrate exists," and "whether the agreement encompasses the dispute." *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004). Thus, where there is a valid written agreement to arbitrate, and the dispute before the court is within the scope of the arbitration agreement, a court must compel arbitration. *E.g.*, *Simitar Entm't, Inc. v. Silva Entm't, Inc.*, 44 F. Supp. 2d 986, 992 (D. Minn. 1999). "As a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Lyster v. Ryan's Steak Houses, Inc.*, 239 F.3d 943, 945 (8th Cir. 2001), *citing Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

Here, the terms of the Agreement are unmistakably clear as to the parties' intent to arbitrate "any" claim "arising out of or related to this agreement."

(Agreement, Sect. 14).[16]   Accordingly, Plaintiff's claims are subject to mandatory arbitration pursuant to the terms of the parties' Agreement.

While the FAA expressly provides that a trial must be stayed in any suit or proceeding brought upon any arbitrable issue, dismissal, and not a stay, is appropriate where, as here, all of the plaintiff's claims are subject to arbitration. *E.g., Mahnke*, 2007 WL 2340056 at 5-6. Accordingly, pursuant to the FAA and the arbitration clause contained in the parties' Agreement, Plaintiff's Amended Complaint should be dismissed in its entirety.[17]

## IV.   CONCLUSION

As discussed above, Plaintiff's Amended Complaint should be dismissed in its entirety. First, the filed rate doctrine bars Plaintiff's attempt to recover damages for the difference between TWC's filed rate and what Plaintiff claims that rate should have been. Second, because Plaintiff attempts to regulate TWC's rate through the vehicle of state law, Plaintiff's claims are preempted by federal law. Finally, this case should also be dismissed because all of Plaintiff's claims are

---

[16]   As this Court has previously noted, "[w]here an arbitration clause is broadly worded, stating that it controls all disputes arising out or related to a contract, it embraces tort claims incident to that contract." *Mahnke v. Executive Tans, USA, LLC*, No. 07-1416, 2007 WL 2340056, *5 (D. Minn. Aug. 13, 2007) (Mag. J Graham).

[17]   In the alternative, if the Court determines that dismissal is not the appropriate remedy, TWC respectfully requests that the Court stay this matter pending arbitration.

subject to binding arbitration.  Accordingly, for all of the reasons set forth above,

Defendant respectfully requests that the Court dismiss Plaintiff's Amended

Complaint in its entirety.

Dated:  November 30, 2007.

KELLY & BERENS, P.A.


By: _s/ Tracey L. Baubie_____
Timothy D. Kelly (#54926)
Tracey L. Baubie (#0224625)
3720 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 349-6171

WARGO & FRENCH LLP
Michael S. French (admitted *pro hac vice*)
Joseph W. Ozmer, II (admitted *pro hac vice*)
1170 Peachtree Street,
Suite 2020
Atlanta, Georgia 30309
(404) 853-1510

**Attorneys for Defendant**