UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Patricia Crumley, on behalf of
herself and all others similarly
situated,

Court File No. 07-cv-3946 (JNE/JJG)

Plaintiff,

**PLAINTIFF'S MEMORANDUM
OF LAW IN OPPOSITION TO
DEFENDANT TIME WARNER
CABLE, INC.'S MOTION TO
DISMISS**

vs.

Time Warner Cable, Inc.,
a division of Time Warner
Entertainment Company, Inc.,

Defendant.

---

## STATEMENT OF FACTS

### 1.   The Parties

Plaintiff Patricia Crumley sued Defendant Time Warner Cable, Inc.,

a division of Time Warner Entertainment Company, Inc. ("Time Warner")

on behalf of herself and all other similarly situated individuals and entities

who at any time from 2002 to the present purchased any of Time Warner's

cable services.  (*See* Amended Complaint ("Compl."), ¶ 1, [Docket No. 5].)

Time Warner is a corporation organized and existing under the laws of the

State of Delaware, with its principal office and place of business located in

Stamford, Connecticut.  (Compl. ¶ 9.)  Time Warner has done business in at least 33 states, including Minnesota.  (Id.)

Crumley was, and is, at all times relevant to these proceedings, a resident and citizen of the City of Minneapolis, Minnesota, and was a Time Warner subscriber.  (Compl. ¶ 8.)  Plaintiff alleges that Time Warner deceptively and unlawfully charged Plaintiff for system upgrades it never undertook and for which Plaintiff paid (id.), and deceptively and unlawfully overcharged customers for upgrades to its cable television service, for which it had been previously reimbursed from its customers located in Minnesota.  (Compl. ¶ 2.)  As a result, Time Warner reaped millions of dollars in improperly increased revenues, while Plaintiff and Class members were double-billed and overcharged by Time Warner. (Compl. ¶ 3.)

Time Warner was formed in 1989 through the merger of Time Inc.'s cable television company, American Television and Communications Corporation, and Warner Cable, a division of Warner Communications. (Compl. ¶ 10.)  Time Warner is the second largest cable operator in the United States and employs nearly 46,000 individuals.  (Id.)  Time Warner

was in the business of providing cable television, internet, and telephone

service for residents of Minnesota. (Compl. ¶ 11.)  Due to a subscriber

exchange arrangement with Comcast Corporation, Time Warner, by mid-

2007, no longer provided service to Minnesota residents.  (*Id.*)

**2.** **Federal and Local Cable Regulation**

In 1984, Congress passed the Cable Communications Policy Act of

1984 ("1984 Cable Act") that, for the most part, deregulated cable service

rates.  (Compl. ¶ 12.)  By 1992, cable rates had increased at three times the

rate of inflation and public outcry over these skyrocketing prices led to the

passage of the Cable Television Consumer Protection and Competition Act

of 1992 ("1992 Cable Act").  (Compl. ¶ 13.)  The thrust of the 1992 Cable

Act was to regulate cable rates where effective competition did not exist.

(Compl. ¶ 14.)  It provided for basic tier cable rate regulation until a

defined threshold of competition was reached within a local franchise area,

at which time the rate regulation would cease.  (*Id.*)  It also authorized the

FCC to regulate rates for upper tiers of cable service (cable television

service beyond the limited basic cable television channels) in

noncompetitive markets and authorized cable subscribers, franchising

authorities or other interested parties to file complaints directly with the FCC to initiate FCC investigation of upper tier cable rates.  An outpouring of cable rate complaints ensued.  (*Id.*)

With the stated goal of further promoting competition and improving service for customers, Congress passed the Telecommunications Act of 1996 ("1996 Act").  (Compl. ¶ 15.)  Among its far reaching deregulatory effects, this bill removed the right of cable subscribers to file rate complaints directly with the FCC and sunset, on March 31, 1996, upper tier cable rate regulation by the FCC without any evidentiary requirement that cable markets were competitive.  (*Id.*)

3.     **The SC and the 750 MHz Upgrade**

As a means of settling large numbers of rate complaints against various cable operators, the FCC negotiated and finalized a settlement with various cable operators that it labeled the "SC" ("SC"). (Compl. ¶ 16.) The SC provided for the dismissal of over 900 individual rate complaints against Time Warner alone; in exchange, Time Warner was required to upgrade its cable systems in the majority of its service areas to 750Mhz service ("the upgrades").  (*Id.*)  The upgrades would allow Time Warner to

provide to its customers, *inter alia*, expanded capacity of its cable television systems for additional television networks and channels as well as advanced telecommunications services. Time Warner and other cable television companies signed the SC on or around November 30, 1995. (*Id.*) Time Warner claimed that it did not have the resources to provide for the agreed upon upgrades.

In response, the FCC allowed Time Warner to pre-capitalize the approximately $4 billion cost of the upgrades by charging each subscriber in the local franchise area up to a total of $180.00 spread over 5 years, from 1996 through 2000. (Compl. ¶ 17.) Specifically, the FCC allowed Time Warner to charge each customer $1 per month for the first year, $2 per month for the second year, $3 per month for the third year, $4 per month for the fourth year, and $5 per month for the fifth year, for a total of up to $180.00 per customer to pay for the systems upgrade. (*Id.*)

Under the terms of the SC, Time Warner was precluded from charging an amount in excess of $180 total per customer for the system upgrade. (Compl. ¶ 18.) From 1996 through 2000, Time Warner assessed and collected from its subscribers the allowed pre-capitalization

surcharges and completed the promised upgrade to its cable system.

(Compl. ¶ 19.)

**4.** **FCC Form 1235**

Pursuant to the 1992 Cable Act, the primary method developed by

the FCC for establishing initial rates for cable service was a "benchmark

formula," designed to ensure that an operator's regulated rates did not

exceed what the operator would charge if it faced effective competition.

(Compl. ¶ 20.)  At the same time, the FCC realized that the benchmark

approach might deny cable operators in high cost areas the opportunity to

recover their legitimate costs, and it developed an alternative approach to

establish initial cable rates based on cost-of service showings.  (*Id.*)

By 1994, the FCC established a streamlined ("abbreviated") cost-of-

service process for operators who had established their initial rates using

the benchmark process but had an interest in recovering "significant

capital expenditures" such as a fiber optic upgrade.  (Compl. ¶ 21.)  The

requirements were captured in the Form 1235 by 1996.  (*Id.*) The rationale

behind the Form 1235 was to allow any cable operator to recover the costs-

of-service portion of any upgrade by adding a network upgrade surcharge,

determined pursuant to a FCC Form 1235 filing, to the regulated service

rates.  (*Id.*)  A Form 1235 could not be filed unless a significant upgrade to

the cable system had been completed.  (*Id.*)

As noted above, Time Warner was required under the SC to

upgrade its cable systems and was limited to an additional charge limited

to $180 per subscriber over five years, ending in 2000.  (Compl. ¶ 22.)

TWC did not implement or complete any significant upgrade of its cable

system subsequent to the upgrade completed pursuant to the SC.  (Compl.

¶ 23.)  Because Time Warner did not perform any subsequent substantial

upgrade to its cable system other than the upgrade completed under the

SC, Time Warner was not eligible to file a Form 1235 to recover any further

network upgrade expenses.  (*Id.*)  Nevertheless, Time Warner submitted a

Form 1235, and charged its basic service customers an upgrade fee,

essentially for the same upgrade completed under the SC, by incorporating

a monthly network upgrade charge into the regulated monthly rate for

basic cable service.[1]  (*Id.*)

---

[1] Contrary to Time Warner's assertion, the City of Minneapolis never
affirmatively "approved" the Form 1235 filing.  No rate order was ever
issued by the City.  The City allowed the proposed rate to go into effect by

By filing Form 1235(s) without having completed any subsequent substantial upgrades, Time Warner unlawfully overcharged each Minneapolis customer for an upgrade for which it was not permitted to be reimbursed.  (Compl. ¶ 24.)  Time Warner did not file with the FCC a "Petition for Special Relief and for a Determination of Effective Competition" for the Minneapolis area, nor was any such petition granted revoking the City of Minneapolis' rate regulatory authority.  (*Id*.)

This unlawful overcharging has been found in numerous communities where rates have been reviewed.  (Compl. ¶ 25.)  It is and was Time Warner's policy and such policy has been and is being repeated in many Time Warner served communities. (*Id*.)  Time Warner's policy of unlawfully overcharging occurred throughout the State of Minnesota and may result in additional claims being brought on behalf of Minnesota residents who are not residents of Minneapolis.  (Compl. ¶ 26.)

Plaintiff was a customer of Time Warner since at least 1999 and until Minneapolis entered into the subscriber exchange arrangement. (Compl. ¶

---

default, presumably on the assumption Time Warner's submission was based on a truthful request for a legitimate upgrade.

27.)  Time Warner unlawfully charged Plaintiff for reimbursement of Time

Warner's upgrade for which it was not permitted to be reimbursed.  (Id.)

**5.**      **Plaintiff's and the Class's Claims**

      **A.**      **Declaratory Judgment determining as unlawful Time Warner's filing of FCC Form 1235 to recover non-existent post-SC upgrade cost**

      Under federal law, a cable operator such as Time Warner was to use

Form 1235 only to recover costs after a significant cable system upgrade

was made and only for an upgrade not completed pursuant to a SC.

(Compl. ¶ 39.)  Time Warner filed a Form 1235 in 2001 and did not

complete any significant cable system upgrade other than the system

upgrade to 750 MHz that it completed pursuant to the SC.  (Compl. ¶ 40.)

Time Warner received reimbursement for all upgrade expenses permitted

by the SC and, through Form 1235, continued to charge customers for the

same upgrade.  (Compl. ¶ 41.)  Time Warner's submission of Form 1235 to

recover system upgrade costs already recovered pursuant to the SC was

fraudulent and unlawful.[2]  (Compl. ¶ 42.)

---

[2] Contrary to Time Warner's assertion, the FCC serves as the sole forum for rate appeals, filed by municipalities.  Injured customers, however, may seek redress in this venue to recover for fraudulent overcharges that violate the law.

**B.**     **Consumer Fraud Violation of Minnesota Statutes §§ 325F.68 – 325F.70**

Time Warner's acts, practices, misrepresentations, and omissions constitute fraud, false pretense, false promise, misrepresentation, misleading statements, and deceptive practices in violation of the Minnesota Prevention of Consumer Fraud Act (MPCFA), Minn. Stat. § 325F.69 subd. 1.  (Compl. ¶ 44.)  Time Warner represented that its charges under the SC and Form 1235 were for reimbursements of expenses incurred for upgrades.  (Compl. ¶ 45.)  Time Warner received reimbursement for all upgrade expenses permitted by the SC and, through Form 1235, unlawfully charged customers for the same upgrade.  (Compl. ¶ 46.)  Time Warner knew or should have known that it made false representations to its customers concerning its entitlement to reimbursement and the amount due for reimbursement for upgrades by both filing Form 1235 and through subsequent subscriber service payment requests. (Compl. ¶ 47.)  Time Warner concealed the fact that, *inter alia,* it had been reimbursed for the upgrades under the SC and was not entitled to recover any further reimbursement using FCC Form 1235.  (Compl. ¶ 48.)  As a direct and proximate result of Time Warner's fraudulent and

deceptive conduct, Plaintiff and Class Members have suffered actual injury and are entitled to restitution and/or actual damages and/or equitable and injunctive relief, costs, and reasonable attorney fees pursuant to Minn. Stat. § 8.31, subd. 3a. (*Id.*)

### C.   <u>Unjust Enrichment</u>

As a result of its deceptive practice to overcharge Plaintiff and Class members, Time Warner received millions of dollars worth of payments to which it is not entitled and the circumstances described in this Complaint are such that it would be unjust for Time Warner to retain the benefit. (Compl. ¶ 49.)  As a result, Plaintiff and Class members have been irreparably harmed and are entitled to damages and/or equitable relief as may be determined at trial.  (Compl. ¶ 50.)

### <u>ARGUMENT</u>

The district court, faced with a motion to dismiss for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6), must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S. Ct. 2499, ___ (2007); *McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787 (8th Cir. 2007).  The district court must also

accept all reasonable factual inferences in favor of the nonmovant.  *Creason*

*v. City of Washington*, 435 F.3d 820, __ (8th Cir. 2006).

I.     **Plaintiff's Claims Are Not Preempted.**

In its motion to dismiss, Time Warner contends that *Keogh* has

established "the substantial breadth" of the filed rate doctrine.  Defendant

Motion to Dismiss, p. 11.  Time Warner conveniently omits that the filed

rate doctrine has been repeatedly called into question post-*Keogh*.  *Blaylock*

*v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1100 (W.D. Wash. 2007).

("Even in the antitrust context, the Court's justification for the doctrine has

been repeatedly called into question since its inception in the 1920s.").

"For instance, [the Supreme Court] refused to overrule *Keogh* only because

it had been an 'established guidepost at the intersection of the antitrust

and interstate commerce statutory regimes.'" *Id.* (quoting *Square D Co. v.*

*Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 423 (1986)).  "At the same

time, the *Square D* Court 'assume[d] that . . . the *Keogh* decision was

unwise as a matter of policy.'" *Id.* (quoting *Square D*, 476 U.S. at 420)).[3]

---

[3] Plaintiff also points out that *Square D* involved a rate filed with the
commission and allowed to go into effect by the commission.  The New
Mexico Court of Appeals recently distinguished *Square D* with a situation
where the state Public Service Commission did not specifically approve of

Further, *Square D* and *Keogh* were held not to be applicable to the facts of *Blaylock*, "which involve[d] a challenge under consumer protection laws to a rate approved by a state regulatory agency." *Blaylock*, 504 F. Supp. 2d at 1100.  Also telling is the fact that Time Warner does not cite a single case where the filed rate doctrine applied to a cable operator.

The filed rate doctrine is particularly inapplicable to this case, as Time Warner is not a common carrier, and Plaintiff has alleged only state law claims that are not preempted by the filed rate doctrine or the Cable Act.

**A.**     <u>**The filed rate doctrine is inapplicable because Time Warner is not a common carrier.**</u>

Time Warner argues in its motion to dismiss that Plaintiff's claims are barred by the filed rate doctrine; this argument, however, is misplaced here.  The filed rate doctrine originated in a Supreme Court decision involving interstate freight shippers that violated the Sherman Antitrust Act by charging tariff rates under an illegal price fixing agreement.  *Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156 (1922).  The filed rate doctrine has

---

the amount to be rebated in fees and thus such fees could not be categorized as "filed rates."  *Summit Properties, Inc. v. Pub. Service Co. of N.M.*, 138 P. 3d 716, 724 (N.M. Ct. App. 2005).

been adopted and applied in limited situations involving "common carriers," as seen in the Communications Act of 1934.  47 U.S.C. § 203(a) and § 203(c).  The Communications Act requires a common carrier to file its rates with the FCC. 47 U.S.C. § 203(a).  Therefore, in order for the filed rate doctrine to apply to this case, Time Warner must be considered a common carrier.

A common carrier is "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy. . . but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier." 47 U.S.C. § 153(10).  The Supreme Court interpreted the last clause of this definition in *F.C.C. v. Midwest Video Corp.*, holding that the FCC "may not regulate cable systems as common carriers."  440 U.S 689, 709 (1979).  "We think authority to compel cable operators to provide common carriage of public-originated transmission must come specifically from Congress."  *Id.*

The D.C. Court of Appeals recently expounded upon the refusal to grant common carrier status to cable operators.

> [B]ecause the Communications Act explicitly directed the
> Commission not to treat broadcasters as common carriers, the
> Court concluded that it was not reasonably ancillary to the
> Commission's effective performance of its responsibilities
> relating to broadcast television for the Commission to impose
> common-carrier obligations on cable television systems.
> While the Court recognized that the statutory bar on treating
> broadcasters as common carriers did not apply explicitly to
> cable systems, the Court explained that, 'without reference to
> the provisions of the Act directly governing broadcasting, the
> Commission's jurisdiction under [Title I] would be
> unbounded.' The Court refused to countenance such a
> boundless view of the Commission's jurisdiction, noting that,
> '[t]hough afforded wide latitude in its supervision over
> communication by wire, the Commission was not delegated
> unstrained authority.'

*Am. Library Ass'n v. F.C.C.*, 406 F.3d 689, 701-02 (D.C. Cir. 2005) (quoting

*Midwest Video Corp.*, 440 U.S. at 706) (internal citations omitted). Federal

law also makes clear that Time Warner's cable system is not subject to FCC

regulation. "Any cable system shall not be subject to regulation as a

common carrier or utility by reason of providing any cable service." 47

U.S.C. § 541(c).

Moreover, Time Warner may not be considered a common carrier

for certain portions of service even when other services may invoke

common carrier status. "Since it is clearly possible for a given entity to

carry on many types of activities, it is at least logical to conclude that one

15

can be a common carrier with regard to some activities but not others."

*Nat'l Ass'n of Regulatory Util. Comm'rs v. F.C.C.*, 533 F.2d 601, 608 (D.C. Cir.

1976). *Midwest Video* also supports this argument. "A cable system may

operate as a common carrier with respect to a portion of its service only."

*Midwest Video Corp.*, 440 U.S. at 701 n.9. Put quite simply, Time Warner

cannot credibly meet its burden to show filed rate protection.

**B.     The filed rate doctrine and the Cable Act do not preempt
        Plaintiff's allegations.**

Even if this Court finds Time Warner to be a common carrier,

Plaintiff's allegations of consumer fraud are not preempted by the filed

rate doctrine or the Cable Act, as the file rate doctrine does not preclude

state law claims for fraud that do not *directly* target a regulated rate.

Plaintiff does not challenge a regulated rate; instead she claims she was

fraudulently double-billed for a nonexistent service upgrade. Case law

supports this conclusion that the filed rate doctrine does not apply here. In

*Qwest v. Kelly*, for example, the Arizona Court of Appeals affirmed the

lower court's denial of a utility's motion to dismiss, finding that the

tenants' claims did not fall within the Arizona Corporation Commission's

jurisdiction, and that the filed rate doctrine did not preclude a fraudulent

misrepresentation claim. 204 Ariz. 25 (Ariz. App. 2002).  The *Qwest* court

noted that the plaintiff's "tort and contract claims are the type of

traditional claims with which our trial courts of general jurisdiction are

most familiar and capable of dealing." *Id.* at 32.

The *Qwest* court went on to cite a list of cases that refused to apply

the filed rate doctrine.  *Id.* at 36 (citing *Pink Dot Inc. v. Teleport Commc'ns*

*Group*, 107 Cal. Rptr. 2d 392 (Cal. Ct. App. 2001); *Spielholz v. Superior Court*,

104 Cal.Rptr.2d 197 (Cal. Ct. App. 2001); *Tenore v. AT & T*, 962 P.2d 104

(Wash. 1998) (distinguishing *Hardy v. Claircom Communications Group, Inc.*,

937 P.2d 1128 (Wash. App. 1997) and holding filed rate doctrine does not

preempt claims for fraud and deceptive practices).  Additionally, in *In re*

*Long Distance Telecommunications Litigation*, the Sixth Circuit permitted a

class of customers to proceed against long distance telephone companies,

upholding state law claims for fraud and RICO.  *In re Long Distance*

*Telecommunications Litig.*, 831 F.2d 627, 633 (6th Cir. 1987).

Importantly, *Qwest* held that "it is not the conduct of the defendant

that controls 'whether the filed rate doctrine applies.  Rather, the focus for

determining whether the filed rate doctrine applies is the impact the

court's decision will have on agency procedures and rate determinations.'" 204 Ariz. at 37 (quoting *H.J. Inc. v. NW. Bell Tel. Co.*, 954 F.2d 485, 489 (8th Cir. 1992)); *see also id.* at 37 (citing *Wegoland v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994) (filed rate protection justified where *reasonableness* of rates approved by the regulatory agency at issue).  Here, Plaintiff is not challenging the *reasonableness* of the rates charged by Time Warner.

The principal purpose and direct effect of Plaintiff's allegations are not to control rates charged by Time Warner.  "A judicial act constitutes rate regulation *only if its principal purpose and direct effect are to control rates*." *Spielholz v. Superior Court of Los Angeles County*, 86 Cal. App. 4th 1366, 1374 (Cal. App. 2001)(emphasis added).  *Spielholz* involved claims for false advertising which the court found did not constitute direct regulation of rates.  The *Spielholz* court elaborated:

> For example, an injunction that prevents a wireless telephone service provider from charging specified rates would directly regulate rates.  Similarly, if a cause of action directly challenges a rate as unreasonable, an award of damages or restitution to compensate a customer for the difference between the rate paid and what the court determines to be a reasonable rate would directly regulate rates.  In general, a claim that directly challenges a rate and seeks a remedy to limit or control the rate prospectively or retrospectively is an attempt to regulate rates and is therefore preempted. . . [A]

claim that *directly challenges some other activity*, such as false
advertising, and requires a determination of the value of
services provided in order to award monetary relief is not rate
regulation.

*Spielholz*, 86 Cal. App. 4th 1366, 1374-75 (emphasis added); *see also Union*

*Ink Co., Inc. v. AT&T Corp.*, 801 A.2d 361, 374 (N.J. Super. 2002) (quoting

*Spielholz*, 86 Cal. App. 4th at 1375) ("We agree in principle with the

distinction drawn…between claims that *directly* challenge the rate charged

and claims that challenge some other practice, such as false advertising.  A

monetary award based on the latter type of claim would affect the rate

charged *only incidentally and is not direct price control or rate regulation*."

(emphasis added).  "[A] carrier that is charging a 'reasonable rate' for its

services may still be subject to damages for a non-disclosure or false

advertising claim under applicable state law if it misrepresents what those

rates are or how they will apply, or if it fails to inform consumers of other

material terms, conditions, or limitations on the service it is providing." *Id.*

at 376.

In *State of Minnesota v. Worldcom, Inc.*, 125 F. Supp.2d 365 (D. Minn.

2000), the court considered a similar plea by defendant seeking to avoid

application of the state consumer fraud statute to long distance phone

rates.  In that case, the State of Minnesota was accusing Worldcom of

misleading consumers about the actual cost of long distance service.  In

refusing to dismiss the complaint based on alleged preemption found in

the Federal Communications Act ("FCA"), the court held:

> Neither the text nor the structure of the FCA evidences
> an intent of Congress to regulate long-distance
> telecommunication services so extensively as to
> preempt a lawsuit brought by a state law enforcement
> official to enforce state laws prohibiting deceptive
> advertising.  Worldcom has not identified any provision
> of the FCA demonstrating that Congress intended to
> regulate the advertisement of interstate long distance
> telephone services.  While § 203 of the FCA addresses
> the "classifications, practices, and regulations affecting"
> the rates charged for long distance telephone services,
> Worldcom has cited no authority construing those
> terms to include advertising.  Nor has Worldcom shown
> that either § 203 of the FCA or, indeed, any other section
> of the FCA imposes any duties or confers any rights on
> a carrier regarding the advertisement of long distance
> telephone services.

*Id.* at 372.  A similar analysis is applicable here.  This lawsuit is not about

changing established rates.  Nowhere in the Cable Act is there any

statement of an attempt by Congress to preempt lawsuits brought to avoid

the double billing activity complained of here.

Indeed, it is even appropriate for a court to take the charged price

into consideration when determining a monetary award.  "[A] case may

present a question of whether a . . . service had indeed been provided in

accordance with the terms and conditions of a contract or in accordance

with the promises included in…advertising." *Union Ink*, 801 A.2d at 376.

"[A] court need not rule on the reasonableness of the . . . carrier's charges

in order to calculate compensation for the injury that was caused, even

though it could be appropriate for it to take the price charged into

consideration in calculating damages." *Id.*  "A carrier may charge

whatever price it wishes and provide the level of service it wishes, as long

is it does not misrepresent either the price or the quality of service.  *Id.*  The

*Union Ink* Court concluded that "plaintiff's State law claims for relief based

on the Consumer Fraud Act, common law fraud, and negligent

misrepresentation" were not barred by federal law.  *Id.* at 378.

Here, Plaintiff is not directly challenging the rates charged by Time

Warner, and Plaintiff is not requesting this Court to regulate Time

Warner's rates.  Plaintiff has alleged that Time Warner violated Minnesota

state consumer protection law by misrepresenting that its charges were for

reimbursements of expenses incurred for upgrades, and by receiving

reimbursements for upgrade expenses when, in fact, no upgrades were

performed by Time Warner.  Plaintiff's claims are not preempted by the

filed rate doctrine or the Cable Act.

### C.     The Cable Act does not preempt Plaintiff's state law claims where there is an indirect impact on rates.

Time Warner adds that Plaintiff's claims are preempted by the Cable

Act.  But actions with only an indirect effect on cable rates do not warrant

preemption under the Cable Act.  "The language used in both the 1992 and

the 1984 versions of section 543(a), is not indicative of a congressional

intent to extend the statute's preemptive effect so as to include all state

regulation which might indirectly affect cable rates."  *Morrison v. Viacom,*

*Inc.*, 61 Cal. Rptr. 2d 544, 552 (Cal. Ct. App. 1997).  "Where Congress has

intended to pre-empt all state laws affecting a particular subject, it has

employed language well suited to the task."  *Cable Television Ass'n of N.Y.,*

*Inc. v. Finneran*, 954 F.2d 91, 101 (2d Cir. 1992).  "Thus, for example,

statutes which expressly preempt state regulations which 'relate to' a given

subject matter or field are indicative of an expansive preemptive intent."

*Morrison*, 61 Cal. Rptr. 2d at 552.  "The Cable Acts do not employ such

broad language; they do not preempt state laws that 'relate to' rate regulation." *Id.* at 552-53. "[G]iving the words in the pre-emption clause their broad, common sense meaning, we cannot conclude that Congress intended to reach everything that relates to rate regulation." *Finneran*, 954 F.2d at 102 (internal citations omitted). "[W]e doubt that Congress meant to pre-empt all state laws that relate to the regulation of rates for the provision of cable services." *Id.* at 102.

In *Finneran*, the plaintiff alleged consumer protection claims. "[T]here can be no doubt that the central purpose of the state regulation is to protect consumers, not to indirectly regulate rates outside of the state's direct grasp. After all, the only affect this regulation will have on other rates is to raise them." *Id.* "In sum, neither the language of the pre-emption clause, nor the structure of the statute, nor the regulatory and legislative background, nor the relevant case law supports [defendant's] claim that the Cable Act expressly pre-empts all state regulation that will effect rates for the provision of cable services." *Id.* "We conclude, as have courts construing both the 1984 and the 1992 Cable Acts, that the statutory language employed in the Cable Acts indicates that Congress intended the

preemptive scope of section 543(a) to be narrow." *Morrison*, 61 Cal. Rptr.

2d at 553. "Thus, the Cable Acts prohibit states from *directly* regulating

cable rates; they do not prohibit states from enforcing any law which may

*indirectly* affect the rates any company may charge." *Id*.

Here, as in *Finneran*, Plaintiff has alleged consumer protection

claims. The central purpose of Plaintiff's Complaint is not to regulate rates

– it is to seek redress for Minneapolis consumers who paid Time Warner

for a service upgrade it never actually performed. Accordingly, Time

Warner's motion to dismiss based on the filed rate doctrine and

preemption should be denied.

## II.    Time Warner's Arbitration And Class Action Waiver Clause Is Unconscionable and Unenforceable.

Time Warner claims that pursuant to its standardized, non-

negotiable, take-it-or-leave-it services "agreement," its customers have

completely relinquished their rights to aggregate claims and proceed as a

class action before the Court. Class action waiver clauses embedded in

arbitration provisions such as the one Time Warner invokes here have

increasingly failed under judicial scrutiny because they are inherently and

unfairly one-sided, would effectively exculpate liability for wrongdoing,

and contravene public policies protecting consumers.  Further, the

arbitration clause constitutes an invalid contract of adhesion and is

unconscionable under Minnesota law.  Therefore, Time Warner, as the

party invoking the arbitration provision, cannot meet its burden to

establish the enforceability of the arbitration clause.

"In determining whether a valid agreement to arbitrate exists, courts

look to the applicable state law, as long as the state law invoked applies to

contracts generally and is not aimed a arbitrations clauses specifically."

*Onvoy, Inc. v. SHAL, LLC*, 669 N.W. 2d 344, 354 (Minn. 2003) (citing

*Doctor's Associates, Inc. v. Cassarotto*, 517 U.S. 681 (1996)).  Under Section 2

of the Federal Arbitration Act, 9 U.S.C. §1, *et seq.* ("FAA"), arbitration

provisions governing disputes "shall be valid, irrevocable, and

enforceable, *save upon grounds as exist at law or in equity for the revocation of*

*any contract*."  9 U.S.C. § 2 (emphasis added).  The validity of the

arbitration clause is for the Court, and not a arbitrator, to decide.  *See*

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006); *Prima Paint v.*

*Flood & Conklin*, 388 U.S. 395, 403 (1967) (ruling that arbitration is to

proceed only "once [the court] is satisfied that the making of the

agreement for arbitration…is not in issue") (footnote omitted).

A.   **Time Warner's Arbitration Clause Is An Invalid Contract Of Adhesion Under Minnesota Law.**

Under Minnesota law, Time Warner's arbitration and class action

waiver clause is an unenforceable contract of adhesion.  "A contract of

adhesion is one 'drafted unilaterally by the business enterprise and forced

upon an unwilling and often unknowing public for services that cannot

readily be obtained elsewhere.'"  *Vierkant v. AMCO Ins. Co.*, 543 N.W. 2d

117, 120 (Minn. App. 1996) (quoting *Schlobohm v. Spa Petite, Inc.*, 326 N.W.

2d 920, 924 (Minn. 1982)); *see also Siebert v. Amateur Athletic Union*, 422 F.

Supp. 2d 1033, 1040 (D. Minn. 2006) (applying same Minnesota law

standard).

There can be no doubt whatsoever that Time Warner's arbitration

agreement constitutes an adhesion contract.  First, as Time Warner's own

declarant makes unequivocal, the arbitration clause is unilaterally drafted

by Time Warner and presented to its customers without negotiation.  *See*

Declaration Jeannie Boldt ("Boldt Decl.") at ¶ 5 (stating that the service

agreements containing the arbitration clause "were periodically updated

by [Time Warner]," and were thereafter "sent to customers with the

customer's monthly bill.").  Further, neither plaintiff Patricia Crumley nor

any other Time Warner customer had an opportunity to even review, let

alone execute or negotiate, the services agreement or arbitration clause

contained in it.  Instead, it was sent as a "bill-stuffer" contained in a

monthly invoice that Time Warner argues was accepted by paying the

invoice.  *See* Boldt Decl. at ¶¶ 8-9.

Second, Plaintiff and others like her could not possibly have known

of the 2006 arbitration provision Time Warner proffers at the time she

commenced service with it in 1999, nor at any time from 2000 through 2005

when the facts that give rise to this complaint transpired.  Bold Decl. at ¶

8.[4]  Third, cable television services are by nature not services that can be

readily obtained elsewhere as, in fact, Time Warner exclusively provided

such services in Minneapolis during the relevant time period.  Therefore,

Plaintiff and the proposed class had no meaningful choice other than to

---

[4] Time Warner alludes to prior service agreements that may have governed Plaintiff's relationship with Time Warner, but makes no averment to meet its burden to show that any agreement prior to 2006 contained an arbitration provision or a class action waiver clause.

accept Time Warner's services agreement as offered, demonstrating that it is a contract of adhesion.

"Minnesota courts may refuse to enforce contracts of adhesion." *Siebert v. Amateur Athletic Union*, 422 F. Supp. 2d at 1040. "Under Minnesota law, when determining whether an arbitration agreement constitutes an invalid contract of adhesion, courts examine 'the sophistication of the parties, the circumstances surrounding the execution of the agreement, and the burden arbitration places on the complaining party." *Alexander v. Minn. Vikings Football Club*, 649 N.W. 2d 464, 467 (Minn. Ct. App. 2002) (quoting *Ottman v. Fadden*, 575 N.W. 2d 593, 597 (Minn. Ct. App. 1998)).

Here, Time Warner is one of the most sophisticated cable service providers on the planet holding virtually all the bargaining power. (*See, e.g.*, Compl. at ¶¶ 9-11.) Plaintiff and the proposed class, by contrast, are mere consumers of services. Further, as set forth more fully below, by purporting to preclude the aggregation of claims into a potential class action, Time Warner's arbitration clause places an unfair burden on claimants who must fund expensive individual dispute resolution,

including, inevitably, the hiring of counsel to represent them through

complex mine field of federal and local regulations and procedures

implicated by Time Warner's conduct, the costs of which would surely

eclipse the value of any one individual's claim.  The resulting burden the

operation of this clause would place upon Time Warner's customers

would be fatal to their ability to protect their interests and prosecute their

rights as  individual litigation would be cost prohibitive.  Time Warner's

arbitration agreement should be rejected on the lone basis that it is an

invalid contract of adhesion as "[u]nder *Ottman*, an arbitration agreement

that is a contract of adhesion is invalid." *Id.* at 467 (citing *Ottman v. Fadden*,

575 N.W. 2d 593).

> **B.** **The Class Action Waiver Clause Contained In Time Warner's Arbitration Clause Renders It Unconscionable Under Minnesota Law.**

Time Warner's adhesive arbitration and class action waiver clause is

unenforceable because it is unconscionable under Minnesota law.  "A

contact is unconscionable if it is 'such as no man in his senses and not

under delusion would make on the one hand, and as no honest and fair

man would accept on the other.'"  *Vierkant v. AMCO Ins. Co.*, 543 N.W. 2d

at 120 (quoting *In re Estate of Hoffbeck*, 415 N.W. 2d 447, 449 (Minn. App. 1987)).

Plaintiff brings this case as a class action because the class mechanism is the only means to provide effective redress of Time Warner's conduct.  Proceeding merely on an individual basis would be far too burdensome to justify the expense of litigation.  *See* Compl. ¶ 34.  "The class action is most often needed in consumer suits where individual claims are small" in relation to the resources required to pursue individual litigation.  *Peterson v. BASF Corp.*, 618 N.W. 2d 821, 826 (Minn. Ct. App. 2000), *aff'd* 675 N.W. 2d 57 (Minn. 2004), *and reaff'd* 711 N.W.2d 470 (Minn. 2006).   Thus, "without a class action the individual claims will go unlitigated, either because the individuals are not aware they are entitled to a recovery or because the claim is so small as to make litigation prohibitively expensive."  *Streich v. Am. Family Mutual Ins. Co.*, 399 N.W. 2d 210, 218 (Minn. Ct. App. 1987); *see also Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("[T]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not

provide the incentive for any individual to bring a solo action prosecuting his or her rights.").

Therefore, courts have declined to enforce contract provisions which purport to waive consumers' rights to proceed as a class action because their enforcement would effectively render them exculpatory contracts preventing victims from vindicating their rights.  *See, e.g. Discover Bank v. Superior Court*, 113 P.3d 1100, 1108 (Cal. 2005) (finding that "although adhesive contracts are generally enforced…class action waivers found in such contracts may also be substantively unconscionable inasmuch as they may operate effectively as exculpatory contract clauses that are contrary to public policy").  As the California Supreme Court recently put it, "[w]hen the [class action] waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages . . . the waiver becomes in practice the exemption of the party 'from responsibility for [its] own fraud, or willful injury to the person or property or another.'"  *Id*. at 1110 (citing Cal. Civil

Code § 1668 (providing that contracts which would exculpate intentional fraud cannot be enforced)).[5]

Recent decisions by courts across the country reflect the trend in American jurisprudence to refuse to enforce class action waivers embedded in contracts of adhesion on the grounds that their operation effectively exculpates wrongdoing.  *See, e.g., Kristian v. Comcast Corp.*, 446 F.3d 25, 54 (1st Cir. 2006) (a "bar on class arbitration threatens the premise that arbitration can be a fair and adequate mechanism for enforcing statutory rights"); *Muhammad v. Country Bank of Rehoboth Beach*, 912 A.2d 88, 101 (N.J. 2006) ("it was unconscionable for defendants to deprive [plaintiff] of the mechanism of a class-wide action, whether in arbitration or in litigation.  The public interest at stake in her ability and the ability of her fellow customers effectively to pursue statutory rights under this State's consumer protection laws overrides the defendants' right to seek

---

[5]  Although class action waiver clauses do not expressly release the drafter from liability, it is through their operation that they exonerate the drafter from liability.  *Scott v. Cingular Wireless*, 161 P.3d 1000, 1007 (Wash. 2007) ("[o]f course, on its face, the class action waiver does not exculpate Cingular from anything; it merely channels dispute resolution into individual arbitration . . . But in effect, this exculpates Cingular from legal liability for any wrong where the cost of pursuit outweighs the potential amount of recovery.").

enforcement" of the class action bar); *S.D.S. Autos, Inc. v. Chrzanowski*, 2007

Fla. App. Lexis 18689 at * 20-29 (Fla. Ct. App. November 26, 2007)

(collecting cases).[6]

Minnesota state courts have not yet addressed the enforceability of

class action waivers.  However, as with the other states' laws at issue in the

cases rejecting class action waivers, Minnesota law similarly disfavors

exculpatory contract clauses.  Because exculpatory clauses "are not favored

in the law," a "clause exonerating a party from liability will be strictly

construed against the benfited party."  *Walton v. Fujita Tourist Enters.*, 380

N.W. 2d 198, 201 (Minn. Ct. App. 1986).  Thus, contract clauses that would

operate to shield a party from its intentional wrongdoing cannot be

enforced.

Indeed, recently, the Minnesota Supreme Court held that an

"exculpatory clause is unenforceable if it . . . purports to release the

benefited party from liability for intentional, willful or wanton acts."  *Yang*

*v. Voyagaire Houseboats, Inc.*, 701 N.W. 2d 783 (Minn. 2005).  Without the

---

[6] Most cases permitting enforcement of class action waivers set no blanket rule as to their validity, but rather recognize that their enforcement must be determined on a case-by-case basis.  *See, e.g., AutoNation USA Corp. v. Leroy*, 105 S.W.2d 190, 199-200 (Tex. Ct. App. 2003).

availability of the class action mechanism, Time Warner will escape

liability for its conduct that plaintiffs allege is intentional.  *See* Compl. at ¶

42 (Time Warner's conduct is "fraudulent"); ¶ 47 (Time Warner "knew or

should have known" of its false representations); ¶ 48 (Time Warner

"concealed" its wrongdoing).  *Scott v. Cingular Wireless*, 161 P.3d at 1008 (a

class action waiver "clause that unilaterally and severely limits the

remedies of only one side is substantively unconscionable"); *Kinkel v.*

*Cingular Wireless LLC*, 857 N.E. 2d at 42 ("the plaintiff's only reasonable,

cost-effective means of obtaining a complete remedy is as either the

representative or a member of a class.").

But regardless of whether Time Warner's conduct is intentional, the

class action waiver provision here still operates as an impermissible

exculpatory contract provision.  Minnesota courts evaluate the

enforceability of exculpatory clauses on a case-by-case basis using a two

prong test to determine:

> (1)  whether there was a disparity of bargaining power
> between the parties (in terms of a compulsion to sign a
> contract containing an unacceptable provision and the
> lack of an ability negotiate elimination of the
> unacceptable provision); and (2) the types of services

> being offered or provided (taking into consideration
> whether it is a public or essential service).

*Schlobohm v. Spa Petite, Inc.*, 326 N.W. 2d at 923 (internal citations omitted);

*see also Whyte v. Am. Bd. of Physical Medicine*, 393 F. Supp. 2d 880, 888 (D.

Minn. 2005).

Here, consideration of these two factors demonstrates that the class

action waiver clause is unenforceable under Minnesota law. As to the first

prong, and as explained above, there can be doubt that Time Warner's

services "agreement" is a contract of adhesion reflecting the great disparity

in bargaining power between a corporate multinational goliath and lone

individual consumer of cable television services.

As to the second prong, the cable television services at issue here are

public and essential. "[I]n the determination of whether the enforcement

of an exculpatory clause would be against public policy, the courts

consider whether the party seeking exoneration offered services of great

importance to the public, which were a practical necessity for some

members of the public." *Schlobohm v. Spa Petite, Inc.*, 326 N.W. 2d at 926.

Cable television services connect users with certain media unavailable

through other sources which are essential to consumers and are therefore

subject to public regulation. *Id.* at 925 (services subject to public regulation are considered "public or essential").

Through the unilateral imposition of its class action waiver, via a contract of adhesion, Time Warner would effectively exonerate itself from liability for improper conduct in its provision of essential public services. *See, e.g. Discover Bank v. Superior Court*, 113 P.3d 1100; *Scott v. Cingular Wireless*, 161 P.3d 1000; *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250; *Muhammad v. Country Bank of Rehoboth Beach*, 912 A.2d 88, 101. Under the circumstances presented here, individual suits (or arbitrations) are cost prohibitive such that the vast majority of affected consumers would not pursue litigation and thus be denied vindication of their rights. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("[t]he realistic alternative to a class action is not 17,000,000 individual suits, but zero individual suits, as only a lunatic or fanatic sues" for small sums of money).

Moreover, without class actions, consumers would have far less ability to vindicate important public policies embodied in Minnesota's Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69. "[O]ne of the

central purposes of the Consumer Fraud Act is to address the unequal

bargaining power that is often found in consumer transactions." *Wiegand*

*v. Walser Automotive Groups*, 683 N.W.2d 807, 812 (Minn. 2004). The well-

defined public policy to protect consumers is facilitated by allowing

private litigants to enforce consumer rights of others through

representative litigation. *Boubelik v. Liberty State Bank*, 553 N.W.2d 393, 405

(Minn. 1996) ("in keeping with the public policy against consumer fraud,

the legislature recognized this fact and allowed private individuals to

enforce the Act as so-called 'private attorneys general'"). "[T]he class

action is superior to other methods in promoting the public purpose . . . to

protect those who cannot protect themselves." *Rathbun v. W.T. Grant Co.*,

219 N.W.2d 641, 653 (Minn. 1974) (ensuring the vindication of important

public policy embodied in anti-usury statute rendered class action superior

method to adjudicate claims despite some difficulties in management of

the class).

　　As Plaintiff alleges, Time Warner's conduct has affected numerous

Minnesota consumers. *See* Compl. at ¶¶ 25-26. Because these many

Minnesota consumers' rights will not be litigated nor vindicated without a

class action, operation of Time Warner's class action waiver would thwart

the essential purpose and public policies of the Minnesota Prevention of

Consumer Fraud Act.  "[T]o preclude class treatment of consumers' claims

would distort the statutory scheme, undermine  . . . private enforcement

mechanisms and often make relief the statute contemplates unavailable, as

a practical matter."  *S.D.S. Autos, Inc. v. Chrzanowski*, 2007 Fla. App. Lexis

18689 at *25 (applying Florida's consumer protection statute); *see also*

*Muhammad v. County Bank Rehoboth Beach*, 912 A.2d at 102-103 (court must

consider more than the vindication of just the named plaintiff's rights

because the "public interests affected by the contract" require a "broader

inquiry into how class action waivers affect various interests protected

under" consumer protection laws); *Kristian v. Comcast Corp.*, 446 F.3d at 59

("[w]hen Congress enacts a statute that provides for both private and

administrative enforcement actions, Congress envisions a role for both

types of enforcement," such that '[w]eakening one of those enforcement

mechanisms seems inconsistent the Congressional scheme").  Indeed, it

would be a perverse result to allow Time Warner to impose adhesive, one-

sided terms in order escape liability under a statute meant to address the unfairness that can result from disparate bargaining power.

In short, Time Warner's "class action waiver effectively prevents one party to the contract, the consumer, from pursuing valid claims, effectively exculpating the drafter from potential liability for small claims, no matter how widespread." *Scott*, 161 P.3d at 1008. The class action waiver clause is unconscionable and unenforceable for these reasons.

**C.     The Arbitration Clause Is Unconscionable Because It Is Unfairly One-Sided.**

Time Warner's arbitration clause is also unenforceable on the independent ground that the it is unfairly one-sided. First, the class action waiver itself is unfairly one-sided because commercial entities do not have occasion to sue their customers as a class. *Kinkel v. Cingular Wireless LLC*, 857 N.E. 2d at 40 ("although both parties ostensibly waived the ability to pursue a class action, the limitation applies, in practice, only to prevent consumers 'from seeking redress for relatively small amounts of money'") (quoting *Szetela v. Discover Bank*, 118 Cal. Rptr. 2d 862, 867 (Cal. App. 2002)).

Second, the Time Warner arbitration clause is not bilateral – that is, it forces parties in the weaker bargaining position to pursue all of their rights or remedies solely in arbitration, but reserves for only Time Warner the ability to enforce its rights as it deems fit, including through the judicial process.  While the arbitration provision itself appears to apply to both Time Warner and its customers, elsewhere in the services agreement Time Warner reserves for itself the opportunity to take any and all action to protect its interests.  It states:  "TWC [Time Warner] shall have the right to take any action that TWC deems appropriate to protect the Services . . ." *See* Boldt Decl. at Ex. B (services agreement section 9).  This provision can fairly be read as Time Warner carving out the ability to protect its financial and other interests associated with providing the cable television "Services," through judicial means.

Such one-sided arbitration clauses have been held to be unconscionable.  "Although parties are free to contract for asymmetrical remedies and arbitration clauses of varying scope,  . . .  the doctrine of unconscionability limits the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum on the weaker party

without accepting the forum for itself."  *Armendariz v. Foundation Health Psychcare Servs., Inc.*, 6 P.3d 669 (Cal. 2000).  *See also Iberia Credit Bureau, Inc. v. Cingular Wireless*, LLC, 379 F.3d 159, 169 (5th Cir. 2004) (one-sided obligation to arbitrate disputes unenforceable); *Flores v. Transamerica Homefirst, Inc.*, 113 Cal. Rptr. 2d 376, 382-383 (Cal. App. 2001) (arbitration agreement did "not display a modicum of bilaterality" such that the "unilateral obligation to arbitrate is so one-sided as to be substantively unconscionable").  Thus, Time Warner's obligation to proceed in arbitration is illusory, and thus cannot comport with the reasonable expectations of consumers, rendering the clause unconscionable under Minnesota law.

### D.    The Entire Arbitration Provision Is Unenforceable

Time Warner's arbitration clause contains a severability provision that provides that "[i]f any portion of this section is held to be unenforceable, the remainder shall continue to be enforceable."  Boldt Decl. Ex. B.  As Plaintiff has established, the arbitration clause is an invalid contract of adhesion and unconscionable in its entirety and therefore cannot be enforced in any aspect.  *See Iberia Credit Bureau, Inc.,* 379 F.3d at

172 (severability clause could not save enforceability of one-sided

arbitration agreement).

However, where arbitration clauses contain such severability

provisions, but also class action waivers ruled be unenforceable, courts

have enforced the remaining aspects of the arbitration clause.  *Kinkel*, 857

N.E. 2d at 277-278; *Muhammad*, 912 A.2d at 103.  Thus, if the Court rules

that only the class action waiver aspect of the arbitration provision is

unenforceable, plaintiff may pursue a class action remedy in arbitration.[7]

> **E.**     **Plaintiff's Claim For Injunctive Relief Is Not Subject To The Arbitration Clause.**

By its express terms, Time Warner's arbitration clause does not

govern plaintiff's claims for injunctive relief.  *See* Boldt Decl. at Exh. B at

section 14 (the arbitration clause begins, "*Except for claims for injunctive*

*relief . . .*") (emphasis added)).  Accordingly, Plaintiff's claims for injuctive

relief must proceed in this judicial forum.

---

[7]  Indeed, under the Time Warner services agreement, arbitration shall be governed by applicable rules of the American Arbitration Association, which expressly provide for class action arbitration of consumer disputes. (*See* Boldt Decl. Exh. B; American Arbitration Association Supplementary Rules for Class Arbitration (available at www.adr.org/sp.asp?id=21936)).

<u>**CONCLUSION**</u>

Plaintiff's consumer fraud and unjust enrichment claims are not preempted by the filed-rate doctrine or the Cable Act and Time Warner's arbitration and class action waiver clause is unconscionable and unenforceable.  The Court, therefore, should issue a report and recommendation denying Time-Warner's motion to dismiss Plaintiffs' First Amended Class Action and Declaratory Judgment Complaint.

Dated:  January 10, 2008        **CHESTNUT & CAMBRONNE, P.A.**

By <u>/s/  Karl L. Cambronne</u>
    Karl L. Cambronne, #14321
    Jeffrey D. Bores, #227699
    Brian N. Toder, #17869X
    Bryan L. Bleichner, #0326689
    3700 Campbell Mithun Tower
    222 South Ninth Street
    Minneapolis, MN 55402
    (612) 339-7300
    Fax:  (612) 336-2940

A. Hoyt Rowell, III
T. Christopher Tuck
James L. Ward, Jr.
RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN, L.L.C.
1037 Chuck Dawley Blvd., Bldg. A
Mount Pleasant, SC 29464
(843) 727-6500
Fax:  (843) 216-6509

Gary K. Shipman
William G. Wright
SHIPMAN & WRIGHT, LLP
575 Military Cutoff Road
Suite 106
Wilmington, NC 28405
 (910) 762-1990
Fax:  (910) 762-6752
Michael W. Sobol
Joseph R. Saveri
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA 94111-3339
(415) 956-1000
Fax:  (415) 956-1008

**ATTORNEYS FOR PLAINTIFF**